Roy M. TEEL, Arlie D. Teel, Roy M. Teel Company, Inc., and SJM, Inc. Appellants,

v.

PUBLIC SERVICE COMPANY OF OKLAHOMA, Transok Pipeline Company, Appellees.

No. 61225.

Supreme Court of Oklahoma.

Dec. 24, 1985.

As Corrected Jan. 2, 1986.

Rehearing Granted and Opinion Amended July 14, 1987.

Dissenting Opinion July 14, 1987.

Rehearing Denied Jan. 11, 1989.

James R. Eagleton, Jim F. Gassaway, E. John Eagleton, Marc F. Conley, Houston & Klein, Inc., Tulsa, for appellants; John S. Lowe, of counsel.

Rosenstein, Fist & Ringold and Linda Cole McGowan, Tulsa, for appellees.

KAUGER, Justice.

The questions presented are: whether Transok Pipeline Company and Public Service of Oklahoma (appellees/purchasers), must account for the fair market value of gas produced on leases in which Roy M. Teel, appellant, owned a working interest, and if so, the market value of the gas; whether the purchasers converted Teel's gas; whether the purchasers were unjustly enriched by investment of the gas proceeds; whether the purchasers must account for interest; whether this appeal was properly and timely brought; and whether the right to appeal was waived by acceptance of funds held in suspense by the purchasers. We find the appeal was properly and timely brought, and that limited to the facts presented here a pipeline purchaser who buys gas from a cotenant/operator is a converter after notice is received that the other cotenant has revoked the operator's right to dispose of the gas.[1] However, because Teel will receive interest under the conversion statute, we do not find that the purchasers were unjustly enriched.

Teel and his family have a working interest in five wells within a common source of supply located in Pittsburgh County, Oklahoma. The wells include the Bender Well (Sec. 33–T9N–R16E), the Presson Well (Sec. 31–T9N–R16E), the Smith Well (Sec. 5–T8N–R16E), the McDuff Well (Sec. 32–T9N–R16E) and the Katy Well (Sec. 28–T9N–R–16E). PSO and Transok bought gas from R.H. Siegfried, R.H. Siegfried, Inc., and George F. Collins, Jr., (operators).

---

1. Insofar as *Teel* announces a rule of conversion, it is confined to the peculiar scenario found herein.

Teel executed a farm out agreement with the operators on December 7, 1966, covering the Bender and Katy Wells providing that after drilling and completion costs were recovered (pay-out) each would own one-half of the working interest. The terms of the operating agreement described the lease as joint property. Under the terms, Teel had the right to take his share of all gas produced in kind at any time. In addition, the operators could buy and/or sell Teel's gas at a price not less than the price the operators received. Teel has never taken his gas in kind. On March 18, 1965, Teel and the operators entered into an agreement covering the McDuff well. On November 6, 1972, Teel and the operators contracted concerning the Presson and Smith Wells providing that after pay-out the working interest would be divided equally between Teel, Siegfried, and Collins—no operating agreement was attached.

The operators drilled and completed producing gas wells under the farm-out agreements and paid shut-in gas royalties from 1967 through 1974. On February 26, 1973, the operators contracted to sell gas to Transok for twenty years with price redetermination to be made every three years designating a price redetermination area which included portions of Pittsburgh, Hughes and McIntosh Counties. Teel refused to join in the contract asserting that the terms were unfair and discriminatory. Before pay-out, Transok paid all production receipts to the operators and distributed payment to the royalty owners of royalty under the division order. After pay-out, at the direction of the operators, Transok placed payments due Teel in a special "suspense" account. Transok assigned its contract to PSO on June 25, 1977.

In 1978, Teel brought an action for an accounting and for determination of leasehold rights against the operators, Siegfried and Collins, and the purchasers, PSO and Transok. On August 9, 1979, the trial court ordered all proceeds, including $649,-474.17 in the suspense account attributable to Teel's interest placed in an escrow account during the pending of litigation. The trial court also ordered an accounting to determine completion costs and to establish the pay-out dates. Teel accepted the accounting pay-out dates and settled the dispute with the operator which was approved by the trial court on October 22, 1982. The operators are not parties to this appeal. Transok and PSO agreed that Teel's settlement with the operators did not prejudice claims asserted against the purchasers.

On September 1, 1982, the trial court held that Teel could put on evidence to prove that the contract price was unreasonable however, on October 22, 1982, it reversed its ruling and refused to hold an evidentiary hearing on the relevant marketing area deciding that the fair market value and the market area were identical to the redetermination area and the contract price.

Subsequently, on September 20, 1983, the trial court determined that Teel was entitled to six percent interest from the date the proceeds were received until they were deposited in the escrow account. The trial court directed Teel to submit executed division orders to Transok indicating Teel's interest in the production and ordered liquidation of the escrow account with all proceeds paid to Teel. Teel appeals from the finding that the fair market value was the price received by the operator. He also appeals from the refusal of the trial court to find that the purchasers converted his gas and that they were unjustly enriched by the sale thereof. The purchasers counter that the order issued on October 22, 1982, was a final order which determined all issues and that, therefore, the appeal was untimely. Teel contends that the final order was not issued until September 20, 1983, when the trial court awarded interest.

## I

### THIS APPEAL WAS PROPERLY AND TIMELY BROUGHT

Initially, Teel petitioned for a declaration of the rights of the parties, an order quieting title against claims of other parties, and an accounting. On March 28, 1979, Teel amended the petition, alleging conversion if the remaining gas were insufficient

to pay for the gas already taken. He also sought interest or the highest market value and fair compensation for expenses incurred. The trial court *specifically reserved* the question of whether the purchasers were unjustly enriched by conversion of Teel's gas at the October 22, 1982, hearing. The purchasers contend that the conversion was a second cause of action, and that it was also determined on October 22 when the trial court found Teel was entitled to a split connection and that until the connection was in place Teel should receive his share from the proceeds received by the operator. Teel contends that conversion is not a separate cause of action but an additional theory of recovery arising from the same occurrence.

A cause of action embodies all theories of recovery or damages which emanate from one occurrence or transaction.[2] In this case, Teel's cause of action arose from the breach of his rights concerning production from five wells. Teel originally requested that he be allowed to place a split connection on the wells and to take all the gas produced until the imbalance was corrected. By amendment to the petition, he alleged the possibility of conversion e.g., if the wells did not contain enough gas to balance his breached rights. Conversion is an alternative theory of relief, not a separate cause of action. In any event Teel dismissed the cause of action against the operators after settlement and proceeded on the amended petition seeking damages for the purchasers conversion and interest.

The material inquiry is whether all the issues were completely resolved in the October, 1982 proceedings. The trial court in the September 20, 1983 proceeding, ruled on the motion for summary judgment; the right to recover prejudgment interest, and on an accounting of the money earned by the purchasers on the production proceeds. The court also found Teel was entitled to recover six percent interest and directed execution of a division order. All the issues were not determined until the order of

September 20, 1983, because the October 22, 1982, order did not decide the interest issue, and the matter was passed repeatedly at the request of the purchaser.

Before the enactment of the new pleading code, 12 O.S.Supp.1984 § 2008, issues were raised only by allegations of fact contained in the body of the pleading, and the prayer for relief was not considered part of the pleading. Here, Teel explicitly asserted recovery for interest on the escrow account as an element of his cause of action. The disposal of a segment of a cause of action is not a judgment but an interlocutory summary adjudication, a limitation on the issues to be tried, subject to alteration or modification by the trial court before final judgment. The trial court retains full power to make one complete judgment and dispose of all aspects of the action. An interlocutory summary adjudication does not form an appealable order.[3] The order of October 22, 1982, did not dispose of all the issues in controversy. The final order from which an appeal could be properly and timely brought was September 20, 1983.

## II

### ACCEPTANCE OF ESCROW FUNDS DID NOT WAIVE THE RIGHT TO APPEAL

The purchasers' argue that Teel accepted the benefits of the trial court's judgment thereby waiving his right to appeal. Teel contends that the only benefit he received was the amount paid into an escrow account in accordance with the settlement agreement with the operators, and that the settlement clearly provided that it was made without prejudicing his claims against Transok and PSO.

The general rule is that a party who voluntarily accepts benefits of a judg-

**2.** *Mann v. State Farm Mut. Auto Ins. Co.,* 669 P.2d 768, 772 (Okla.1983); *Retherford v. Halliburton Co.,* 572 P.2d 966, 968 (Okla.1978).

**3.** *Anderson v. Falcon Drilling Co.,* 695 P.2d 521, 523 (Okla.1985); *Mann v. State Farm Mut. Auto Ins. Co.,* see note 2 supra.

ment waives the right to appeal.[4] An exception is made if, on appeal, it is possible to obtain a more favorable judgment without the risk of a less favorable judgment. Acceptance of the benefits of the judgment is not inconsistent with an appeal if it is lodged solely to obtain a more advantageous judgment—i.e., a no-risk appeal.[5] It is undisputed that at a minimum Teel was entitled to the money in escrow. Teel does not argue that the amount awarded is not due but that amount and an additional amount should be awarded. Teel has not waived his right to appeal because the actions taken by him are not inconsistent with his position on appeal.[6]

## III

### A PIPELINE PURCHASER WHO BUYS GAS FROM A COTENANT/OPERATOR WITH NOTICE THAT THE OPERATOR LACKS AUTHORITY TO DISPOSE OF ALL THE GAS MAY BECOME A CONVERTER

The determinative issue is whether the purchasers are converters of Teel's gas. The purchasers contend that Teel and the operator are cotenants and that each are entitled to produce the wells. They also argue that it is the operators' responsibility to account to Teel. Teel asserts that the purchasers have taken without a purchase contract, with notice of his interest, and

that they must account for the fair market value of the gas.

■ The owners of undivided interest in oil and gas rights are tenants in common. Each of the cotenants may develop the common property but not to the exclusion of the other cotenants.[7] When gas is discovered by one cotenant, the cotenant may deduct the necessary expenses of developing, extracting, and marketing;[8] but an accounting must be made to the other cotenants for the pro rata share of the production.

■ A tenant in common may lease his/her interest in production without the consent of other cotenants, but in the absence of an express agreement, one cotenant is not an agent of the other. A gas sales contract executed by a cotenant is limited to his/her interest. However, if cotenants name a cotenant as operator to exploit the cotenancy for their mutual profit, they become coadventurers in the enterprise and stand in a fiduciary relationship to one another.[9] Teel, Siegfried, and Collins each owned working interests in the wells. Siegfried and Collins were named the operators, and the operating agreement specifically provided:

"In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and/or gas pro-

---

4. *United Engines, Inc. v. McConnell Const., Inc.,* 641 P.2d 1101, 1105 (Okla.1981); *Tara Oil Company v. Kennedy & Mitchell, Inc.,* 622 P.2d 1076–77 (Okla.1981); *Bras v. Gibson,* 529 P.2d 982–83 (Okla.1974).

5. *United Engines, Inc. v. McConnell Const. Inc.,* see note 3 supra; *Berry v. Empire Indem. Ins. Co.,* 634 P.2d 718, 720 (Okla.1981); *Marshall v. Marshall,* 364 P.2d 891, 895 (Okla.1961).

6. *Bras v. Gibson,* see note 4, supra is distinguishable. In *Bras,* the appellant accepted the judgment from his adversary and then appealed the judgment. In this case, Teel accepted the escrow account from the operator not the purchasers. He did not include the operator in this appeal. He is appealing the judgment which concerns the purchasers. See also *Unterkircher v. Adams,* 714 P.2d 193 (Okla.1985).

7. *De Mik v. Cargill,* 485 P.2d 229, 233 (Okla. 1971); *Dilworth v. Fortier,* 405 P.2d 38, 49 (Okla. 1964); *Harper v. Ford,* 317 P.2d 210, 214 (Okla.

1957); *Coal Oil and Gas Company v. Styron,* 303 P.2d 965, 969 (Okla.1956); *Mershon v. Essley,* 204 Okl. 660, 233 P.2d 293, 297 (1951); *Earp v. Mid–Continent Petroleum Corp.,* 167 Okl. 86, 27 P.2d 855, 858, 91 A.L.R. 188 (1933).

8. *Essley v. Mershon,* 262 P.2d 417, 420 (Okla. 1953); *Earp v. Mid–Continent Petroleum Corp.,* see note 7 supra. See also, Reynolds, "Co-ownership of Property in Oklahoma," 27 Okla.L.Rev. 585, 605 (1974).

9. *Britton v. Green,* 325 F.2d 377, 383 (10th Cir. 1963); *Eagle-Picher Co. v. Mid-Continent Lead & Zinc Co.,* 209 F.2d 917, 919 (10th Cir.1954); *Taylor v. Brindley,* 164 F.2d 235, 240 (10th Cir. 1947). *Young v. West Edmond Hunton Lime Unit,* 275 P.2d 304, 309 (Okla.1954); See also 6 Williams and Meyers, "Oil and Gas Law", p. 868–69, § 990 (1984).

duced from the joint property, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation to purchase such oil and/or gas or sell it to others for the time being, at not less than the price which Operator receives for its portion of the oil and/or gas produced from the joint property."

■ Teel does not dispute that he has not taken his gas in kind or disposed of it in another manner. The agreement gave the operators the discretionary right to sell Teel's interest until he revoked the authority on November 17, 1977. Teel also does not dispute that the purchasers took delivery of Teel's gas which was *produced by the operators*. The trial court found that the operator had bought and sold Teel's gas to Transok and PSO. Under the operating agreement, the operator had the right to do this until revocation. The operators were duty bound to act as a reasonable and prudent operator and police the production of the well because of its fiduciary relationship with Teel as a co-tenant.[10]

■ A division order consists of an agreement between the working interests and the purchasers which provides a formula for payment of the purchaser's price of gas. Its function is to protect the purchaser from liability.[11] Nonetheless, the purchaser is not protected unless the owners of the interest sign the division order.[12] In the absence of an executed division order[13] and in the presence of notice that the non-contracting cotenant has revoked the operator's right to sell, failure of a purchaser to account to each working interest owner for his/her pro rata share of the proceeds subjects the purchasers to the same liability as the operator and the purchaser may become a converter of the property.[14]

■ However, the purchaser must exhibit bad faith or have knowledge that the gas purchased exceeds the ultimate share allotted to the working interest. If so, the purchaser is assessed damages based on the contract price of the underproduced working interest. Otherwise, the purchaser is liable only to the extent that the working interests have been paid under the sales contract. The purchaser may pursue each working interest under the imdemnification clause contained in the gas sales contract. In this case, Teel did not sign the division order until he was ordered to do so by the trial court in September, 1983. The purchasers were aware of Teel's interest because they attempted to reach an agreement with him several times and were in receipt of a copy of his letter revoking the operators' right to deliver his gas to the purchasers.[15] After receiving

---

10. Ellis, "The Production of Gas from Joint Interest Properties," 21st Southwestern Legal Foundation on Oil and Gas Law and Taxation, p. 47, 80 (1970); Note, "Oil and Gas: Production Imbalance in Split Stream Gas Wells—Getting Your Fair Share," 30 Okla.L.Rev. 955, 966 (1977). See also *Beren v. Harper Oil Co.*, 546 P.2d 1356, 1358 (Okla.App.1975).

11. 4 Williams and Meyers, see note 9, supra; at p. 571–72 § 701 Note, "Oil and Gas Production Imbalance in Split Stream Gas Wells—Getting Your Fair Share", see note 10, supra; Hemingway, "The Law of Oil and Gas," p. 3632–63, § 7.5 (2nd Ed.1983).

12. Masterson, "Division Order Problems Created by Apportionment of Royalty", 10 Okla.L.Rev. 289 (1957).

13. 4 Williams and Meyers, see note 11, supra.

14. See 1 Kuntz, "Oil and Gas", p. 242–43, § 11.2 (1962), which states:

"Although independent contractors or agents engaging in various phases of the drilling and completion of the well, but who do not engage in nor participate in the full operation, would undoubtedly be liable as trespassers for the physical damage which they produced, it is submitted that their liability should not extend to the value of the oil or gas produced unless they actually engaged in the production operation as distinguished from engaging in isolated phases of the operation such as cementing, perforating, and clearing. The pipeline or other purchaser who purchased production from one not entitled thereto would be a converter and liable to the true owner."

15. With this knowledge PSO continued to purchase the gas and was not a purchaser in good faith. *Texas Co. v. Pettitt*, 107 Okla. 243, 220 P. 956, 959 (1923). PSO's purchases, coupled with its knowledge, amounts to bad faith and constitutes an action in tort. *Stizel–Weller Distillery v. Norman*, 39 F.Supp. 182, 187 (W.D.Ky.1941). The distinguishing factor between *Moody v.*

the revocation, the purchaser was a converter because it purchased Teel's gas from an operator which was not authorized to deliver it.[16]

## IV

## IN AN ACTION FOR CONVERSION OF PROPERTY, THE MEASURE OF DAMAGES IS THE FAIR MARKET VALUE OF THE PROPERTY

Teel contends that because the purchasers have taken his gas, they are liable for the statutory damages for conversion. In an action for the conversion of property, the measure of damages is the fair market value of the property at the time of conversion and interest thereon—if the party pursues the suit with diligence. An election may be made to take the highest fair market value of the property with interest at any time between the conversion and the verdict.[17] Because the trial court refused presention of any evidence concerning the market value of the gas, this issue is remanded for consideration by the trial court.[18]

The pipeline purchasers submit that *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269, 1273 (Okla.1981), is determinative. In *Tara*, the lessor sued the lessee to establish market value for gas sold under a *royalty* provision in the lease. A royalty interest is an interest in production where property is under an oil and gas lease.[19] *Tara* was specifically limited to a market price gas royalty clause—this is not the question before us. In *Tara* the lease contained a clause which provided that the lessee would pay the royalty interest at the market price at the well. None of the agreements between Teel and the operators contained this language.

The purchasers and the operator were jointly liable for Teel's gas,[20] thus the recovery is limited to the amount, if any, which exceeds the balance in the escrow account.

## V

## BEFORE LITIGANTS MAY RECOVER FOR UNJUST ENRICHMENT, THERE MUST BE ENRICHMENT COUPLED WITH A RESULTING INJUSTICE

Insofar as the argument of unjust enrichment is concerned, before a party may recover unjust enrichment, there must be enrichment to another coupled with a resulting injustice.[21] The receipt of Teel's oil and gas benefited the purchaser but because Teel will receive at the least the market price of his production, with interest, he has not proven an injustice.[22] Additional interest should not be allowed.

---

Wagner, 167 Okla. 99, 23 P.2d 633, 637 (1933) and *Teel* is the nonconsenting cotenant did not revoke the operator's authority; instead he relied on the operator's production to extend his lease.

16. See note 14, supra.

17. Damages are provided in 23 O.S.1981 § 64:
"The detriment caused by the wrongful conversion of personal property is presumed to be:
1. The value of the property at the time of the conversion with the interest from that time; or,
2. Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and,
3. A fair compensation for the time and money properly expended in pursuit of the property."

See also, *Edwards v. Lachman*, 534 P.2d 670, 677 (Okla.1975); *Hamco Oil and Drilling Co. v. Ervin*, 354 P.2d 442, 445 (Okla.1960).

18. Neither party complains of the trial court's denial of trial by jury in the conversion action. On remand, a waiver of trial by jury is not binding on the subsequent trial, if the right to trial by jury is otherwise applicable. *Seymour v. Swart*, 695 P.2d 509, 512 (Okla.1985).

19. *Hays v. Phoenix Mutual Life Ins. Co.*, 391 P.2d 214, 216 (Okla.1964); *Doss Oil Royalty Co. v. Lahman*, 302 P.2d 157, 161 (Okla.1956); *Elliott v. Berry*, 206 Okl. 594, 245 P.2d 726, 729 (1952).

20. *Probst v. Bearman*, 76 Okla. 71, 183 P. 886, 888 (1919).

21. *Efco Importers v. Halsobrunn*, 500 F.Supp. 152, 157 (E.D.Pa.1980); *Sachs v. Continental Oil Co.*, 454 F.Supp. 614, 619 (E.D.Pa.1978).

22. See note 14, supra.

Teel contends he is entitled to recover interest at the rate of six percent per annum on the gas purchased until it was paid into escrow—with the exception that money paid into escrow after July 1, 1980, should draw interest at the rate of 12% under 52 O.S.1981 § 540.[23] He charges that if the purchaser earned more than the six percent and twelve percent, respectively, he is entitled to recover additional monies on a unjust enrichment theory.

 Title 52 O.S.1981 § 540 is inapplicable because it became effective July 1, 1980, after the suit was filed, (1978) and after the court had ordered the funds escrowed (August 9, 1979). Generally, statutes are presumed to operate prospectively. A clear expression of legislative purpose is required to justify a retroactive application, and in the case of doubt, the doubt must be resolved against a retroactive effect.[24] Without express legislation, a statute may not be applied retroactively if it alters the rights and duties under an existing contract, especially if the enactment would affect vested rights or the legal character of past transactions would be prejudiced.[25] Here, the past transaction between the purchaser and operator would be altered prejudicially, it is, therefore, inapplicable.

AFFIRMED IN PART.

REVERSED IN PART AND REMANDED.

DOOLIN, C.J., HARGRAVE, V.C.J., and HODGES, OPALA, ALMA WILSON and KAUGER, JJ., concur.

LAVENDER, SIMMS and SUMMERS, JJ., dissent.

SUMMERS, Justice, dissenting:

I respectfully dissent from the court's election to impose the law of conversion upon controversies of this nature. I would permit Teel to recover by way of "balancing" under the doctrine of restitution. *Beren v. Harper Oil Co.*, 546 P.2d 1356 (Okla.App.1975); *Earp v. Mid–Continent Petroleum Corp.*, 167 Okl. 86, 27 P.2d 855 (1933); *Moody v. Wagner*, 167 Okl. 99, 23 P.2d 633 (1933).

I am authorized to state that LAVENDER and SIMMS, JJ., join in the views expressed herein.

**23.** Title 52 O.S.1981 § 540 provides in pertinent part:

"A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold....

Provided, however, that in those instances where such proceeds cannot be paid because the title thereto is not marketable, the purchasers of such production shall cause all proceeds due such interest to earn interest at the rate of six percent (6%) per annum, until such time as the title to such interest has been perfected....

B. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, as the penalty...."

This statute was amended in 4 Okla.Sess.Laws ch. 141, pp. 390–91 (1985). However the amendment only changed subsection (B) which now provides:

"B. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, calculated from date of first sale."

**24.** *Hammons v. Muskogee Medical Center Authority*, 697 P.2d 539, 542 (Okla.1985); *Trinity Broadcasting Corp. v. Leeco Oil Co.*, 692 P.2d 1364, 1366 (Okla.1984); *Wickham v. Gulf Oil Corp.*, 623 P.2d 613, 615 (Okla.1981); *Wilson v. State ex rel. Okla. Tax Com'n*, 594 P.2d 1210, 1212 (Okla.1979).

**25.** *Wickham v. Gulf Oil Corp.*, see note 24, supra; *Oklahoma Water Res. Bd. v. Central Okla. M.C. Dist.*, 464 P.2d 748, 755 (Okla.1969); *Washabaugh v. Bartlett Collins Glass Co.*, 177 Okla. 159, 57 P.2d 1162, 1164 (1936). See also *Anderson v. Dewey*, 82 Idaho 173, 350 P.2d 734, 738 (1960); *Lake v. Bonynge*, 161 Cal. 120, 118 P. 535, 540 (1911).